UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | |
|---|---|
| Q.W., by his Next Friends and Parents, M.W. and K.T.W., | ) ) ) |
| Plaintiff, | ) Civil Action No. 5: 14-126-DCR ) |
| V. | ) ) |
| BOARD OF EDUCATION OF FAYETTE COUNTY, KENTUCKY, et al., | ) **MEMORANDUM OPINION** ) **AND ORDER** ) |
| Defendants. | ) |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is pending for consideration of Defendant Board of Education of Fayette County, Kentucky's ("Board") motion for judgment. [Record No. 17]  Plaintiffs M.W. and K.T.W. bring this action on behalf of their minor child, Q.W., pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*  They seek reversal of the Exceptional Children Appeals Board's ("ECAB") decision that Q.W. is no longer eligible for specialized educational programming. [Record No. 1]  The Board contends that the ECAB's Decision and Order should be upheld.  For the reasons discussed below, the Board's motion for judgment will be granted.

**I.**

Q.W. has been diagnosed with autism.  He was enrolled as a student in the Burbank United School District in California until 2009.  [Record No. 20-2, p. 1]  Because Q.W. was identified as having a disability under the IDEA, he qualified to receive special education

services from the public school district. An individualized education program team,[1] made up of the child's teachers and parents, met periodically to draft an individualized education plan ("IEP") with Q.W. in mind. 20 U.S.C. § 1414(d)(1)(A) and (B). In California, Q.W.'s 2009 IEP included speech and language therapy, occupational therapy, adaptive physical education, and behavioral therapy. [Record No. 20-2, p. 1]

In August, 2009, Q.W.'s family relocated to Lexington, Kentucky. [Record No. 20-2, p. 2] Q.W.'s California IEP was adopted by the Kentucky ARC during the child's first semester in the Fayette County School District. Under the plan, Q.W. received the following services weekly: two hours of speech therapy, one and a half hours of occupational therapy, and five hours of behavioral therapy. In addition, Q.W.'s parents supplemented the IEP with four hours of various private therapies per week. [ECAB Decision and Order at 1-2] However, due to reports of steady progress and academic achievement, by November 2011, the ARC determined that Q.W. was no longer eligible to receive special education services under the IDEA.[2] [Record No. 17-1, p. 4] The child's parents raised their objections with an administrative Hearing Officer. [Record No. 20-2, p. 4] A hearing on Q.W.'s eligibility was convened over a series of six dates during the spring of 2013 before Hearing Officer Mike Wilson. [*Id.*] During the hearings, Hearing Officer Wilson assessed the credibility of numerous witnesses who were cross-examined by counsel for both parties. On August 12,

---

[1] In Kentucky, this team is referred to as an "Admissions and Release Committee" ("ARC"). 707 KAR 1:002, Section 1(1).

[2] The ARC team reviewing Q.W.'s eligibility drew upon a variety of sources, including *inter alia* a statement of parent concerns, Q.W.'s occupational therapy evaluation, a cognitive assessment, diagnostic achievement tests, communication evaluations, a social competence evaluation, and reports from Q.W.'s teachers. [ARC Conference Summary at 7] Over Q.W.'s parents' objections, the ARC team found that those reports failed to demonstrate a negative effect on the child's performance at school. [Record No. 20-2, p. 3]

2013, Hearing Officer Wilson issued an Opinion affirming the Board's determination of ineligibility. [Hr'g Officer's Decision and Order]  Although it is undisputed that Q.W. has been diagnosed with autism, the Hearing Officer nonetheless found that the child was not eligible for special education services, explaining that the condition did not appear to adversely affect Q.W.'s educational performance. [*Id.* at p. 52]

The plaintiffs appealed the Hearing Officer's decision to the Kentucky Department of Education's ECAB.  On February 28, 2014, the ECAB affirmed, finding that, under the IDEA, "educational performance" does not include the student's performance outside the school setting. [ECAB Decision and Order at 17]  Notwithstanding the plaintiffs' concerns about their son's socialization skills, the ECAB found Q.W. ineligible because of his successful academic performance.  The parents now bring the administrative decision for review before this Court.  *See* 20 U.S.C. §§ 1415(b)(2), 1415(c).

## II.

The IDEA requires local school districts receiving federal funding to assure "all children with disabilities the right to a free and appropriate public education."  20 U.S.C. § 1412(a).  Further, the IDEA requires that each child be educated in the "least restrictive environment" possible. § 1412(a)(5)(A). A school board must "conduct a full and individual initial evaluation" before providing special education services to a child.  20 U.S.C. § 1414(a)(1)(A).  The evaluation should be designed to determine whether the child has a "disability" as defined by the IDEA and the child's educational needs, 20 U.S.C. § 1414(a)(1)(C)(i), and a re-evaluation must be conducted "if the local educational agency determines that the educational or related services needs, including improved academic

achievement and functional performance, of the child warrant a reevaluation." 20 U.S.C. § 1414(a)(2)(A).

Each evaluation and reevaluation must use "a variety of assessment tools and strategies" in gathering relevant "functional, developmental, and academic information, including information provided by the parent," that may assist in determining whether the child has a disability. 20 U.S.C. § 1414(b)(2)(A). The IDEA emphasizes the importance of reviewing "evaluations and information provided by the parents of the child," "current classroom-based, local, or State assessments," "classroom-based observations," and "observations by teachers and related services providers." 20 U.S.C. § 1414(c)(1).

In an action under the IDEA, the district court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(B). *See Deal v. Hamilton County Bd. Of Educ.*, 392 F.3d 840, 849 (6th Cir. 2004). In reaching its decision, the Court must give due weight to state administrative proceedings, depending on whether the finding is based on educational expertise. *Doe v. Bd. Of Education of Tullahoma City Schools*, 9 F.3d 455, 458 (6th Cir. 1993). This process amounts to a "modified de novo review." *N.L. v. Knox County Sch.*, 315 F.3d 688, 692 (6th Cir. 2003).

District courts afford less weight "to an agency's determinations on matters for which educational expertise is not relevant because a federal court is just as well suited to evaluate the situation." *McLaughlin v. Holt Pub. Schs. Bd.*, 320 F.3d 663, 669 (6th Cir. 2003). However, "more weight [. . .] is due to an agency's determinations on matters for which educational expertise is relevant." *Id.* Under this standard, "a district court is required to

make findings of fact based on a preponderance of the evidence contained in the complete record." *Knable ex rel. Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 764 (6th Cir. 2001).

The party seeking relief has the burden of proof when challenging an administrative decision. *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 51 (2005). As the Supreme Court has cautioned,

> [i]n assuring that the requirements of the [IDEA] have been met, courts must be careful to avoid imposing their view of preferable educational methods upon the States. The primary responsibility for formulating the education to be accorded a handicapped child, and for choosing the educational method most suitable to the child's needs, was left by the Act to state and local educational agencies in cooperation with the parents or guardian of the child.

*Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 207 (1982).

### III.

The plaintiffs' Complaint alleges that the Hearing Officer and the ECAB failed to address the appropriate nature and extent of a school district's requirements to provide a child with a free and appropriate education and the criteria applied to the determination of eligibility under the IDEA. [Record No. 1] Additionally, the plaintiff alleges that the ECAB arbitrarily concluded that Q.W. is no longer eligible for special education and related services. [*Id.*]

The IDEA was enacted "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A). The Act defines "children with disabilities" as children having one of the specifically delineated conditions, including autism, "who, by reason thereof, need[] special education and related services." 20

U.S.C. § 1401(3)(A).  The federal regulations promulgated under the statute further define autism as "a developmental disability significantly affecting verbal and nonverbal communication and social interaction, generally evident before age three, that *adversely affects a child's educational performance*."  34 C.F.R. § 300.8(c)(1)(i) (emphasis added).  Thus, in determining IDEA eligibility, the Court must examine whether Q.W.'s autism has an adverse effect on educational performance and whether, as a result, Q.W. needs "special education and related services."[3]

Neither the IDEA nor the federal regulations defines the term "adverse effect on educational performance."  Thus, the Court turns to State regulations pertaining to the education of children with disabilities.  Kentucky's Administrative Regulations define "adverse effect" to mean that "the progress of the child is impeded by the disability to the extent that the educational performance is significantly and consistently below the level of similar age peers."  707 KAR 1:002(1)(2).

Further, neither the Sixth Circuit nor Kentucky has defined "educational performance."  The parties each advocate for a different interpretation of the term.  Q.W.'s parents assert that the Hearing Officer and ECAB erroneously limited the term "educational performance" to purely academic performance.  Instead, the plaintiffs suggest that the term extends beyond academics to include the child's physical, emotional, and social needs.  This expansive definition has been adopted in Maine.  *See Mr. I. ex rel. L.I. v. Maine School Admin. Dist. No. 55*, 480 F.3d 1, 12-13 (1st Cir. 2007) ("In light of Maine's broad notion of 'educational performance' . . . we see no basis for restricting that standard to . . .

---

[3]   Neither party questions that the child has been diagnosed with autism.  Only the effects of the diagnosis on his educational performance are at issue.

performance that is graded"). On the other hand, the Board advances an interpretation that "educational performance" means academic performance only, as New York courts have held. *See A.J. v. Board of Education*, 679 F. Supp. 2d 299, 308 (E.D. N.Y., 2010).

This Court notes that, absent a statutory directive to the contrary, the term "educational performance" should be given its ordinary meaning. *See Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 252 (2004) ("Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose."). And taken at face-value, the term "educational performance" suggests *school-based* evaluation. This interpretation finds support in the IDEA's emphasis on classroom curricula and observation. *See* 20 U.S.C. § 1414(c)(1). Thus, as the Hearing Officer concluded, "[e]ducational performance does not include the student's performance outside the school setting." [Hr'g Officer's Decision and Order at 49]

### IV.

It appears that Hearing Officer Wilson and the ECAB took great care to understand the nature and circumstances of Q.W.'s diagnosis. They reviewed a plethora of testimony in making their determinations, hearing from, *inter alia*: four psychologists, the Director of Special Education, the Related Services Advisor, Q.W.'s teachers, the school system diagnostician, a professor of educational school and counseling psychology, a biostatistics professor, two speech therapists, a speech pathologist, two of Q.W.'s nannies, four occupational therapists, the school guidance specialist, and Q.W.'s mother. The parties also produced a myriad of evaluations, examinations, and reports. Those documents and the witness testimony are part of the record that this Court has considered.

An integrated report, prepared in November 2011 in anticipation of Q.W.'s ARC team meeting, collected data indicating that Q.W. functions "at levels well above that of his peers in cognitive and academic areas." [Fayette Cnty. Pub. Sch. Report at 22]  The report also suggests that Q.W.'s behavior in school was at "levels similar to his peers in the general education environment." [*Id.*]  While the evaluators – Q.W.'s teachers and school therapists – concluded that Q.W. continues to show socio-emotional development consistent with high-functioning autism, they found no adverse effect at school.  Kathy Dykes, the director of special education for Fayette County, testified that Q.W.'s eligibility evaluations (conducted both on behalf of Fayette County and independently) determined that a categorical disability of autism was not met.  [Admin. Hr'g Tr. at 1254]  Dykes found no indication of a significant impact on Q.W.'s performance when compared to similar-aged peers.  [*Id.*]

At home, according to his mother, Q.W. needs a substantial amount of prompting to complete homework and daily tasks and struggles to maintain focus.  Q.W. does well academically, but his parents worry that he has difficulty socializing with his peers.  As a result of social anxiety, Q.W. often chews on his fingers and toes to the point of bleeding. [Admin. Hr'g Tr. at 322]

The private therapists, who see Q.W. in a clinical setting, testified that the child does not perform well socially.  [Reed Dep. 45:3-8]  Although Q.W. has memorized "scripts" to deal with common social situations, he may lack the ability to solve social problems on his own.  [*Id*. 24:24-25-15]  Q.W.'s speech therapist indicated that the child may have difficulty understanding the emotions and feelings of other people.  [Admin. Hr'g Tr. at 453] However, the plaintiffs' private therapists interacted with the child only outside of the school setting.  For example, the child's occupational therapist, Dr. Stamper, never saw him in the

-8-

classroom. [Admin. Hr'g Tr. at 389] Q.W.'s private speech therapist, Trisha Bernard, had never met Q.W.'s teacher or observed him in the classroom. [Admin. Hr'g Tr. at 498] In fact, the plaintiffs elicited testimony from a therapist, Dr. O'Brien, who had never met Q.W. [Admin. Hr'g Tr. at 244]

At school, Q.W. has not shown significant trouble. Kara Yates, Q.W.'s second-grade teacher, testified that Q.W. was academically gifted, "off the charts," and "very high performing student." [Admin. Hr'g Tr. at 806] Additionally, Q.W. behaved "just like any other normal student" in the classroom. Yates indicated that the student's behavior at recess was typical and that he did not exhibit stress at school. [Admin. Hr'g Tr. at 811] The record suggests that any nail-biting at school is uncommon and does not impact Q.W.'s education. [Admin. Hr'g Tr. at 817-819]

Although Q.W.'s parents reported social weaknesses, his teachers found that Q.W. was socially in the high-average range, observing no such deficiencies. Reportedly, Q.W. "has friends at school and gets along well with peers and adults at school," "participates in both structured and unstructured activities," "participates verbally in class," "talks about shared interests with peers," "show the same level of emotion as peers," "can share and take turns without being reminded," "can play games and show good sportsmanship," "cooperates and is respectful," and "transitions well from one activity to another." [Admin. Hr'g Tr. at 698] The school occupational therapist confirmed that Q.W. "has friends. He gets along well. He stays in his seat. He completes his work. He's on task. He interacts well." [Admin. Hr'g Tr. at 779] In peer groups and in the lunchroom, school personnel have not witnessed any negative social responses. [Admin. Hr'g Tr. at 734] In fact, the child is not only receiving good grades, but his teachers have testified that he "was a joy to have" and "a

really great student," adding that they have not encountered ongoing behavioral problems during the school day. [Admin. Hr'g Tr. at 806, 1077]

While there is evidence of a small number of bullying incidents, Yates testified that the difficulty was the result of another student and that Q.W. was not targeted more than his classmates in these episodes. Even after learning of Q.W.'s parents' concerns, Yates never observed any persistent deficits in behavior or sensory regulation impacting the student's ability to interact appropriately with his peers. [Admin. Hr'g Tr. at 829] Q.W.'s third-grade teacher added that Q.W. "is very well liked in the classroom. He has lots of friends. He enjoys his friends. He just seems like another kid in my class." [Admin. Hr'g Tr. at 1065] Dr. Myra Beth Bundy, a professor of psychology with a focus on autism and one of the only private evaluators to observe the student in school, testified that Q.W. "seemed kind to and interested in peers and also showed some very nice basic social skills such as socializing with other children in an informal and age-appropriate way." [Admin. Hr'g Tr. at 876]

Academically, according to the Fayette County Schools diagnostician, Sandra Coleman, Q.W. is "functioning above his peers across the board." [Admin. Hr'g Tr. at 714] Coleman looked at Q.W.'s grades, teacher reports, parent reports, and evaluations of his social, communicative, and adaptive skills. She considered his intellectual potential, standardized age scores, standardized grade scores, and work samples from class. [Admin. Hr'g Tr. at 715]

This evidence reveals a stark divide between the expert testimony of the private evaluators and the classroom observations of Q.W.'s teachers. Q.W. seems to be able to hold his performance to a level appropriate with his peers in academics, adaptive functioning, and social skills, as reported by teachers and therapists who have observed him in the school

environment.  In contrast, his parents and private therapists report deeper concerns about his adaptive and social behaviors in extra-curricular environments.  Attempting to explain this disparity, Dr. Bundy indicated that Q.W.'s social behaviors may be context-dependent, suggesting that parents tend to report a high number of clinically elevated problem behavior scores in comparison to teachers.  [Psychological Consultation, Bundy (citing Nicpon, Doobay, & Assouline, 2010)].  Similarly, Bernard agreed that the structured environment of the classroom may account for Q.W.'s drastically different behavior across varying social settings, [Admin. Hr'g Tr. at 498] and Coleman acknowledged that children commonly "act differently at home than they do at school," particularly because "there are different requirements at school than at home."  [Admin Hr'g Tr. at 695]

The Board has adduced that Q.W. experienced no educational problems in the school setting, and the plaintiffs have not presented sufficient evidence to the contrary.  The preponderance of the evidence – the standard articulated in § 1415(i)(2)(B) of the IDEA – favors the Board.  While "educational performance" may be understood to extend beyond the four corners of a report card to include a student's classroom experience, it does not include the child's behavior at home.  Social and behavioral deficits will be considered only insofar as they interfere with a student's education.  Here, they do not.

Q.W. is not eligible for special education because his educational performance is not significantly below that of his same age peers.  In fact, the child has excelled academically, and the record reflects Q.W.'s mastery of the curriculum being taught.  He is able to attend school regularly and keep up (behaviorally and cognitively) with classroom activities.  Although the record indicates that Q.W. continues to exhibit characteristics on the autism

-12-

spectrum, his intellectual and achievement scores, teacher reports, and scholastic performance suggest that he is successfully acquiring academic and adaptive skills.

## V.

While it may be that Q.W.'s emotional problems are hindering his learning, his parents have not presented any concrete evidence that supports that conclusion. The plaintiffs have failed to demonstrate, by a preponderance of the evidence, that Q.W.'s educational performance was adversely affected by his autism. The ECAB correctly determined that Q.W. was no longer eligible to receive special education and related services pursuant to the IDEA. Accordingly, it is hereby

**ORDERED** as follows:

1. Defendant Board of Education's motion for judgment on the administrative record [Record No. 17] is **GRANTED**.

2. The Hearing Officer's decision is **AFFIRMED**.

This 14th day of January, 2015.



Signed By:
*Danny C. Reeves*  DCR
United States District Judge